IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| STONEEAGLE SERVICES, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 3:11-cv-02408-P |
| | § | |
| DAVID GILLMAN, et al., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Now before the Court are six motions. One of these motions involves findings and recommendations for two additional underlying motions.[1]

First, StoneEagle Services, Inc. ("StoneEagle") filed a Motion to Partially Dismiss the Second Amended Answer and Counterclaims on May 3, 2012. (Doc. 96) After an intervening order, Talon Transaction Technologies, Inc., a Texas Corporation ("Talon-Texas"), and Talon Transaction Technologies, Inc., an Oklahoma Corporation ("Talon-Oklahoma") (collectively, the "Talons") filed a Response on June 6, 2012. (Doc. 126) StoneEagle filed a Reply on June 11, 2012. (Doc. 127)

Second, StoneEagle filed a Motion for Partial Summary Judgment on July 16, 2012. (Docs. 146-48) David Gillman ("Gillman") and the Talons filed a Response on August 6, 2012. (Doc. 167)

Third, Gillman and the Talons filed Objections to the Findings and Recommendation of the United States Magistrate Judge on July 23, 2012. (Docs. 152-61) These findings and recommendations were issued on July 9, 2012 and involve a Second Motion for Order to Show

---

[1] On January 7, 2013, Defendants filed consolidated motions to dismiss following StoneEagle's First Amended Complaint. (Doc. 227) While this Order does not address these pending motions, the principles of res judicata and collateral estoppel may apply in subsequent proceedings.

Cause Why Defendants Should Not Be Held in Contempt filed by StoneEagle and a Motion for Clarification of the Preliminary Injunction Order filed by Gillman and the Talons. (Docs. 42, 50, 144) StoneEagle filed a Response on July 26, 2012. (Doc. 164) Gillman and the Talons filed a Reply on August 9, 2012. (Doc. 169)

Fourth, Gillman and the Talons filed a Motion for Leave to File Supplemental Objections on August 28, 2012. (Docs. 176-77) StoneEagle filed a Response on September 5, 2012. (Doc. 179)

Fifth, Gillman and the Talons filed a Motion to Strike StoneEagle's Proposed Preliminary Injunction and a Motion for Leave to address additional concerns on October 22, 2012. (Doc. 190) StoneEagle filed a Response on October 26, 2012. (Doc. 191) Gillman and the Talons filed a Reply on November 8, 2012. (Doc. 199)

Finally, StoneEagle filed a Motion to Dismiss Nexpay, Inc.'s ("NexPay") Original Complaint on November 26, 2012. (Doc. 8, 3:12-cv-04397-P) NexPay filed a Response on December 17, 2012. (Doc. 221) StoneEagle filed a Reply on December 27, 2012. (Doc. 225)

After reviewing the parties' briefing, the evidence, and the applicable law, the Court:

DENIES StoneEagle's Motion to Partially Dismiss the Second Amended Answer and Counterclaims. In addition, the Court DENIES the Request to Convert this Motion into a Motion for Summary Judgment;

GRANTS StoneEagle's Motion for Partial Summary Judgment;

ACCEPTS and ADOPTS the United States Magistrate Judge's Findings and Recommendation on StoneEagle's Second Motion for an Order to Show Cause Why Defendants Should Not Be Held in Contempt. Therefore, the underlying Motion is DENIED;

DECLINES to ADOPT the United States Magistrate Judge's Findings and Recommendation on Gillman and the Talons' the Motion for Clarification of the Preliminary Injunction Order. Therefore, the Court CLARIFIES the preexisting Preliminary Injunction Order. In doing so, the Court GRANTS the underlying Motions

to Clarify, Strike, and Supplement filed by Gillman and the Talons. In addition, the Court DENIES the Request for Leave filed with the Motion to Strike;

ACCEPTS and ADOPTS the United States Magistrate Judge's Findings and Recommendation that StoneEagle should provide a bond in the amount of $100,000 for the clarified preliminary injunction; and

GRANTS StoneEagle's Motion to Dismiss NexPay's Original Complaint.

## I.     Background

Some lawsuits are easier than others. StoneEagle develops and implements virtual payment systems for a variety of industries. (Doc. 197, p. 3) In 2003, StoneEagle applied for a patent involving a method to facilitate warranty payments in the automotive industry. (*Id.*) This application is still pending. (*Id.*)

Of particular relevance to this lawsuit, StoneEagle's current Chairman and Chief Executive Officer, Robert Allen ("Allen") endeavored to create a payment system for the medical industry that would virtually process medical benefit payments. (*Id.* at 4) On December 5, 2006, Allen applied for a patent to protect StoneEagle's rights under this virtual payment system. (*Id.* at 11) Allen listed himself as the inventor and consulted Gillman during the application process. (*Id.*) StoneEagle alleges that it protected the virtual medical payment system through a variety of protocols, security standards, and agreements to preclude circumvention and maintain confidentiality. (*Id.* at 5) According to StoneEagle, this information is not generally known to the public. (*Id.* at 6)

On or about May 1, 2006, StoneEagle entered a mutual non-disclosure agreement ("the NDA") with Gillman, the company he represented at the time, and its affiliates. (*Id.*) The parties agreed, *inter alia*, to not disclose certain information or authorize anyone else to disclose the information. (*Id.* at 6-7) Parties expressly agreed that unauthorized disclosure—even after

the expiration of the NDA's term—would constitute unfair competition, a breach of the NDA, and result in irreparable injury entitling injunctive relief. (*Id.* at 7)

On or about June 29, 2006, StoneEagle granted Talon-Texas a license to use information related to virtual medical payment processing ("the Licensing Agreement"). (*Id.*) This agreement defined all confidential and proprietary information, obligated the parties to maintain strict confidentiality, and authorized injunctive relief in the event of a breach. (*Id.* at 8) This agreement bound all successors and assigns. (*Id.*) On or around May 30, 2008, the Texas Secretary of State forfeited Talon-Texas because it failed to pay its franchise taxes. (*Id.*)

Following the forfeiture of Talon-Texas, Talon-Oklahoma was formed and Gillman assumed the position of President for the entity. (*Id.*) In August 2008, StoneEagle and Talon-Oklahoma formed what would later be referred to as VPay, Inc. ("VPay") for the purposes of expanding the parties' existing customer base. (*Id.*) At inception, StoneEagle and Talon-Oklahoma each owned 50% of VPay. (*Id.*)

As these activities progressed, Vincent and Jim Valentine ("the Valentines") worked closely with StoneEagle programmers to refine its product offerings. (*Id.* at 9) In November 2009, both VPay and StoneEagle retained the Valentines as independent contractors. (*Id.*) The Valentines executed independent contractor and confidentiality agreements with VPay. (*Id.* at 9-10) Under these agreements, Valentines acknowledged the relationship between VPay and StoneEagle and agreed to not disclose confidential or proprietary information. (*Id.* at 10)

On January 1, 2010, Talon-Oklahoma and SWG Investments, Inc. ("SWG") signed a marketing agreement involving the information related to virtual medical payment processing ("the Marketing Agreement"). (*Id.* at 8) This agreement contained provisions for confidentiality and non-disclosure. (*Id.* at 9) At some point during these transactions, StoneEagle registered

"VPay" and "VCard" as service marks related to processing and distributing virtual payments in the medical industry. (*Id.* at 12) Although StoneEagle's First Amended Complaint reflects that Talon-Texas ceased to exist after 2008, the pleadings also suggest that Talon-Texas obtained a license to use these marks on July 27, 2010. (Doc. 197, p. 12; Doc. 197-1, pp. 87-88)

During the pendency of the medical payment system patent, on July 15, 2010, Gillman and the Talons entered into an agreement with StoneEagle, whereby Gillman and the Talons agreed to: (1) release any rights to this patent; (2) not challenge enforceability; and (3) assign any rights to StoneEagle ("the Release Agreement"). (Doc. 197, p. 11)

On September 7, 2010, the U.S. Patent and Trademark Office (the "PTO") issued U.S. Patent No. 7,792,686 B2 (the "'686 Patent") under the title "Medical Benefits System." (*Id.* at 12) The '686 Patent lists Allen as the inventor and StoneEagle as the assignee. (*Id.*)

With this backdrop in place, in or about August 2011, Gillman purportedly commented to others in the medical industry that he "wrote" and "authored" the '686 Patent. (*Id.* at 13) He also allegedly met with investors such as Nx Systems, Inc. ("NxSystems") and Administrative Insurance Management Services, Inc. ("AIMS") without StoneEagle's representatives. (*Id.*) Upon investigation, StoneEagle asserts that Gillman and the Talons are flouting the aforementioned agreements and seek to establish a competing product "virtually identical to VPay." (*Id.* at 13-16) To facilitate these efforts, Gillman allegedly established Nexpay to process and distribute virtual payments in the medical industry. (*Id.* at 16)

Pausing from the facts, a brief recitation of the procedural history is helpful to bring the present issues to light. On June 16, 2011, StoneEagle sued Gillman and the Talons. (Doc. 2) After intervening filings and orders, Gillman and the Talons filed a Second Amended Answer

and Counterclaims. (Doc. 92) StoneEagle then moved to dismiss those state law counterclaims related to breach of the Licensing Agreement and conversion. (Doc. 96)

On October 14, 2011, the Court enjoined Gillman and the Talons from using Plaintiff's trade secrets and confidential information to set up a competing business. (Doc. 16, pp. 9-10) In particular, Gillman and the Talons were ordered to desist and refrain from:

> using, disclosing and/or otherwise capitalizing upon the Trade Secrets and Confidential Information, other than their permitted use of the Trade Secrets and Confidential Information in the regular course of business as permitted by the Grant of License to Use Proprietary Processes and Confidential Information entered by and between [StoneEagle] and Talon Transactions Technology, Inc., a Texas corporation on June 29, 2006; and

> discussing with and collaborating with Vincent Valentine, Jim Valentine, NxSystems, Inc., TxVia, Inc., First California Bank, and any other third party regarding the use or disclosure of the Trade Secrets and Confidential Information in setting up and/or operating a competing business, the basis of which is the conversion of paper-based insurance claim settlements to virtual, electronic settlements.

(*Id.* at 9) The Court also ordered Gillman and the Talons to:

> fully comply with all confidentiality and non-disclosure requirements to the extent they are contained, referenced, adopted, or acknowledged in the Mutual Non-Disclosure Agreement entered by and between David Gillman and [StoneEagle] on or about May 1, 2006; the Grant of License to Use Proprietary Processes and Confidential Information entered by and between [StoneEagle] and Talon Transactions Technology, Inc., a Texas corporation on June 29, 2006; and the Mutual Confidentiality, Non-Disclosure, Non-Circumvention Agreement entered by [StoneEagle] and Talon Transactions Technology, Inc., an Oklahoma corporation on or about January 1, 2010.

(*Id.* at 10)

This single order sparked a flurry of motions. Plaintiff filed a motion for contempt, alleging that Gillman and the Talons violated the injunction by moving forward with a competing product. (Doc. 42) In response, Defendants moved to clarify, asking the Court to "give the parties clear guidance on how they must operate during the pendency of this action"

and requested "specification so that it may have particularized notice of what is prohibited." (Doc. 48, p. 8; Doc. 50) These two motions were referred to United States Magistrate Judge Kaplan for hearing and recommendation. (Docs. 71, 81) On May 10, 2012, Judge Kaplan held a nine-hour hearing.

On July 9, 2012, the magistrate judge issued his findings and made three specific recommendations. (Doc. 144) First, the judge found that it was "clear that [Gillman and the Talons] violated the spirit of the preliminary injunction, the purpose of which is to prevent them from competing with [StoneEagle] by using trade secrets and confidential information acquired during the course of their business dealings." (*Id.* at 6) Nevertheless, the judge recommended that the Court deny Plaintiff's motion for contempt. (*Id.* at 7) Second, the judge recommended that the injunction be clarified to facilitate compliance and prevent "unwitting contempt." (*Id.*) To clarify, the judge proposed:

> the named defendants and their respective agents, servants, employees, attorneys, and all persons in active concert or participation with them, including Vincent Valentine, Jim Valentine, and NxSystems, Inc., should be enjoined from engaging in any and all business activities that involve processing or distributing virtual payments of insurance claims for the healthcare industry.

(*Id.* at 8) Finally, the judge recommended that StoneEagle post a bond in the amount of $100,000. (*Id.*)

On July 23, 2012, Gillman and the Talons objected to these findings and recommendations. (Doc. 152) Without ruling on the findings and recommendations, on September 12, 2012, the parties were ordered to confer about the preliminary injunction and submit proposed injunctive language. (Doc. 183) On October 10, 2012, the parties submitted proposed orders for a preliminary injunction. (Docs. 188-89) Gillman and the Talons

subsequently moved to supplement their own briefing, strike StoneEagle's proposed order, and requested leave to address additional concerns. (Docs. 176, 190)

In a related matter, on October 31, 2012, NexPay sued StoneEagle, seeking a declaratory judgment that it did not infringe on the '686 Patent. (Doc. 1, 3:12-cv-04397-P)  StoneEagle moved to dismiss. (Doc. 8, 3:12-cv-04397-P)  Thereafter, that case was transferred to this Court and consolidated with the present dispute under case number 3:11-cv-02408-P. (Docs. 10, 11, 3:12-cv-04397-P)

On November 11, 2012, StoneEagle filed its First Amended Complaint and sued Gillman, the Talons, and Nexpay (collectively, "the Defendants"). (Doc. 197)  StoneEagle sues for: (1) declaratory relief; (2) misappropriation of trade secrets and confidential information; (3) breach of contract under various agreements entered into between the parties including, *inter alia*, the Licensing Agreement; (4) breach of the Release Agreement; (5) patent infringement; (6) service mark infringement; (7) counterfeiting under the Lanham Act; and (8) unfair competition. (*Id.* at 18-26)  Beyond that, StoneEagle seeks fees and a permanent injunction. (*Id.* at 27-31)

Notwithstanding the pendency of this lawsuit, a preliminary injunction, and after termination of all licensing and service mark agreements, StoneEagle contends that Defendants proceed undaunted in their efforts to launch a competing business. (*Id.* at 16)  From December 2011 through February 2012, NexPay supposedly processed over $900,000 in payments using a like process and system. (*Id.*)  Moreover, on or around February 1, 2012, Defendants allegedly confused customers by using the VPay mark to process a payment file totaling $1,546,046.56. (*Id.* at 17)  In addition, on March 22, 2012, Defendants purportedly began processing virtual payments under the names "NexPay" and "QuicRemit." (*Id.*)  The payment advice under these

systems is apparently identical to VPay. (*Id.* at 17-18) StoneEagle also avers that Defendants falsely represent to customers that VPay has changed its name to QuicRemit. (*Id.* at 18)

Bringing this all together: (1) StoneEagle still moves to partially dismiss the Second Amended Answer and Counterclaims; (2) StoneEagle still moves for partial summary judgment on issues related to the '686 Patent; (3) Gillman and the Talons still object to the findings and recommendations; (4) Gillman and the Talons still wish to supplement these objections; (5) Gillman and the Talons still move to strike StoneEagle's proposed preliminary injunction order; and (6) StoneEagle still moves to dismiss NexPay's Original Complaint.

## II.    Discussion

### a.  StoneEagle's Motion to Partially Dismiss the Second Amended Answer and Counterclaim

StoneEagle moves to dismiss (1) Talon-Oklahoma's breach of the Licensing Agreement claim because Talon-Oklahoma was not a party to the agreement, and (2) the conversion claim because Texas law does not recognize the conversion of intangible rights. (Doc. 92, p. 1) Alternatively, StoneEagle seeks summary judgment on these issues and requests an opportunity for the parties to present evidence outside the pleadings. (*Id.* at 3)

#### i.  Talon-Oklahoma's Claim for Breach of the Licensing Agreement

First, StoneEagle argues that Talon-Oklahoma lacks standing to enforce the Licensing Agreement because it was not a party to the contract. (Doc. 92, pp. 3-5)

##### 1.  Legal Standard

Where, as here, a party brings state law causes of action, federal courts apply state substantive law and federal procedural law. *Cf. Foradori v. Harris,* 523 F.3d 477, 486 (5th Cir. 2008). In the absence of controlling state court decisions, a federal court must make an "*Erie*

guess" as to how the high state court would apply the substantive law. *Cf. Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (quoting *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 483 (5th Cir. 2008)).

A party has standing to sue in contract if the party was in a privity relationship with the contracting parties or attained third party beneficiary status. *See Maddox v. Vantage Energy, LLC*, 361 S.W.3d 752, 756 (Tex. App.—Fort Worth 2012, pet. dism'd) ("To establish standing to assert a breach of contract cause of action, a party must prove its privity to the agreement or that it is a third-party beneficiary."). As a stranger to the contract, a third party beneficiary may recover only if the contracting parties: (1) intended to benefit the third party, and (2) entered into the agreement directly for the third party's benefit. *Basic Capital Mgmt. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 900 (Tex. 2011) ("A third party may recover on a contract made between other parties only if the parties intended to secure some benefit to that third party, and only if the contracting parties entered into the contract directly for the third party's benefit."); *see also Refinery Holding Co., L.P. v. TRMI Holdings, Inc. (In re El Paso Refinery, L.P.)*, 302 F.3d 343, 354 (5th Cir. 2002) ("In order to qualify as a third-party beneficiary, a party must establish both that (1) the contracting parties intended to confer some benefit to the third party, and (2) the contracting parties entered into the contract directly for the third party's benefit."). Under third party beneficiary law,

> [t]he intention to contract or confer a direct benefit to a third party must be *clearly* and *fully spelled* out or enforcement by the third party must be denied. Consequently, a presumption exists that parties contracted for themselves unless it *clearly* appears that they intended a third party to benefit from the contract.

*Basic Capital Mgmt.*, 348 S.W.3d at 900 (emphasis added) (quoting *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999) (internal citations and quotation marks

omitted)); *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) ("[I]n the absence of a clear and unequivocal expression of the contracting parties' intent to directly benefit a third party, courts will not confer third-party beneficiary status by implication.").

### 2. Analysis

StoneEagle's principle argument is that Talon-Oklahoma lacks standing to sue in contract because it was not a party to the Licensing Agreement. (Doc. 92, pp. 3-4) StoneEagle further alleges that Talon-Oklahoma is not a successor or assignee as intended under the Licensing Agreement. (Doc. 127, p. 2) In addition, the Marketing Agreement cannot serve as an extension of the Licensing Agreement because StoneEagle was not a party to the Marketing Agreement. (*Id.* at 3-4)

The Talons respond that Talon-Oklahoma was a third party beneficiary under the Licensing Agreement and is therefore entitled to enforce its provisions. (Doc. 126, p. 5) The Talons assert that the Licensing Agreement secured benefits to third party affiliates such as Talon-Oklahoma. (*Id.* at 5-6) In particular, the parties used language indicating that the agreement "shall be binding upon and inure solely for the benefit of the parties hereto and their respective successors or permitted assignments." (Doc. 126-1, p. 18) Moreover, the Marketing Agreement, as "an extension of the Licensing Agreement" identifies Talon-Oklahoma as a party and lists StoneEagle under the recitals. (Doc. 126, p. 6) The recitals state, *inter alia*, that: "[Talon-Oklahoma] holds a valid and binding agreement with StoneEagle, 'Grant of License to Use Proprietary Processes and Confidential Information' dated June 29, 2006 [i.e., the Licensing Agreement] which provides [Talon-Oklahoma] an exclusive right to market the product now trademarked and known as VPay." (Doc. 126-2, p. 1)

Reviewing the record and briefing in support, Talon-Oklahoma has proper standing to sue for breach of the Licensing Agreement because it qualifies as a third party beneficiary under the agreement. First, the parties explicitly stated that the Licensing Agreement would be binding and directly benefit the parties *as well as* their successors and permitted assigns. (Doc. 126, p. 5; Doc. 126-1, p. 18) While Talon-Oklahoma was not in existence at the time of contracting, that does not *ipso facto* negate the intent to benefit a party properly fitting the legal status of a successor or permitted assignee. (Doc. 127, p. 2) Second, the Marketing Agreement subsequently entered into by SWG and Talon-Oklahoma shores up any doubt that Talon-Oklahoma was a third party beneficiary by expressly stating that StoneEagle and Talon-Oklahoma are operating under the Licensing Agreement. (Doc. 126-2, p. 1; Doc. 127, p. 3) Although StoneEagle was not a party to this contract, the final page bears the signature and indorsement of Phillip A. Bogner, then and perhaps current Vice President and Chief Financial Officer of StoneEagle. (Doc. 126-2, p. 15) Piecing the record together, the parties spelled out an intent to directly benefit certain successors and subsequent agreements reflect that Talon-Oklahoma was in fact one of those entities.

In short, dismissal is not appropriate because the record presents sufficient facts to establish that Talon-Oklahoma has proper standing to bring suit for breach of the Licensing Agreement. *See, e.g.*, *Basic Capital Mgmt.*, 348 S.W.3d at 900-01 ("SABRE-borrowers provided a mechanism for ART and TCI to hold investment property directly but in a way that would provide Dynex greater security. If Dynex and Basic did not intend the Commitment to benefit ART and TCI directly, then the Commitment had no purpose whatever. . . . The Commitment itself, and the undisputed evidence regarding its negotiation and purpose, establish that ART and TCI were third party beneficiaries."); *Stine v. Stewart*, 80 S.W.3d 586, 591-92

(Tex. 2002) ("Here, the entire agreement is obviously not for Stine's sole benefit. However, certain provisions in the agreement expressly state the Stewarts' intent to pay Stine the money due to her. . . . The agreement's language clearly shows that Stewart intended to secure a benefit to Stine as a third-party creditor beneficiary.").

### ii. Conversion Claim

Second, StoneEagle asserts that the conversion claim fails as a matter of law because Texas does not recognize intangible rights under this cause of action. (Doc. 96, pp. 5-6) In the Second Amended Answer and Counterclaim, Gillman and the Talons assert: "StoneEagle has wrongfully exercised dominion and control over Talon's intellectual property by using it for unauthorized purposes, including incorporation or use of such property in connection with processing payments via VPay." (Doc. 92, p. 29) This intellectual property includes software, programs, copyrighted customer service software, and certain portions of copyrighted processes reduced to tangible documents. (Doc. 92, pp. 14-15; Doc. 126, p. 8) The Second Amended Answer and Counterclaim further states: "As part of its marketing efforts, StoneEagle is using Talon's copyrighted information." (Doc. 92, p. 22) The Response elaborates that "StoneEagle exercised dominion and control over those documents containing copyrighted material when it posted them on its website as part of its marketing strategy." (Doc. 126, p. 8)

### 1. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint when a defendant shows that the plaintiff has failed to state a claim for which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal v. Ashcroft*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)). The factual matter contained in the complaint must allege actual facts, *not* legal conclusions dressed up as facts. *Id.* at 1949-50 ("Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'") (quoting *Twombly*, 550 U.S. at 555). Additionally, the factual allegations of a complaint must state a plausible claim for relief. *Id.* A complaint states a "plausible claim for relief" when the factual allegations contained therein infer actual misconduct on the part of the defendant, not a "mere possibility of misconduct." *Id.*; *see also Jacquez v. Procunier*, 801 F.2d 789, 791-92 (5th Cir. 1986).

Although a motion to dismiss is directed at the face of the pleadings, a court may also review any document incorporated into the pleadings and take judicial notice as permissible under the Federal Rules of Evidence. *Lovelace v. Software Spectrum*, 78 F.3d 1015, 1017-18 (5th Cir. 1996) ("Normally, in deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint. However, courts may also consider matters of which they may take judicial notice."); *see also* Fed. R. Evid. 201(f) ("Judicial notice may be taken at any stage of the proceeding."). A document is "incorporated in the complaint" if the plaintiff refers to the document in the complaint. *See Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) ("[T]his Court restricted such consideration to documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim.").[2]

---

[2] For the purposes of this Order, the Courts reviews all documents attached to StoneEagle's First Amended Complaint under Exhibit A and all documents attached to the Talons' Response to StoneEagle's Motion to Dismiss under Exhibits 1 and 2 because these documents are referred to in the pleadings. (Docs. 126-1, 126-2, 197)

## 2. Analysis

StoneEagle argues that a conversion claim under Texas law cannot rest on the underlying subject matter of intellectual property. (Doc. 96, p. 5) StoneEagle maintains that the intangible property at issue—copyrights and software—did *not* merge into tangible form. (Doc. 127, p. 5) In addition, the record does not support any contention that StoneEagle purloined the property through marketing activities. (*Id.* at 6)

"Texas law has never recognized a cause of action for conversion of intangible property except in cases where an underlying intangible right has been merged into a document and that document has been converted." *Express One Intern., Inc. v. Steinbeck*, 53 S.W.3d 895, 901 (Tex. App.—Dallas 2001, no pet.); *see also Neles—Jamesbury, Inc. v. Bill's Valves*, 974 F. Supp. 979, 982 (S.D. Tex. 1997); *Carson v. Dynegy, Inc.*, 344 F.3d 446, 456 (5th Cir. 2003) (explaining that Texas conversion law "concerns only physical property"). In *Carson*, the Fifth Circuit, applying Texas conversion law, distinguished between conversion claims involving only intellectual property and those involving intellectual property reduced to its tangible form. *Carson*, 344 F.3d at 456. *Carson* drew dividing lines between a successful claim involving a preexisting worksheet that embodied an alleged copyright and an unsuccessful claim stemming from the income earned through alleged copyright infringement. *Compare id., with Quantlab Techs. Ltd. (BVI) v. Godlevsky*, 719 F. Supp. 2d 766, 779 (S.D. Tex. 2010) ("The thrust of Quantlab's claim is not that Godlevsky took a physical object such as a hard disk, computer, or CD-ROM. Indeed, Quantlab's Complaint fails to allege that any physical object was taken at all. Rather, Quantlab alleges that Godlevsky misappropriated its intangible intellectual property. Because intellectual property is not subject to conversion under Texas law, Quantlab's conversion claim must therefore fail.").

Viewing the conversion counterclaim in the light most favorable to the nonmoving party, dismissal is not proper at this time. Aligning the facts with the allegations, it is plausible that StoneEagle acquired an existing document with copyrighted information and posted it online. Taking the pleadings as true and correct, this act is in accord with precedent dictating a ruling that—at the Rule 12(b)(6) stage—intangible property has merged with tangible property. Should evidence come to light that no such documents existed at the time StoneEagle allegedly acquired the copyrighted material and subsequently displayed the information on its websites, the conversion claim will ultimately fail as a matter of law. *See, e.g.*, *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 627 (S.D. Tex. 2011) ("Alliantgroup alleges that Feingold converted its client lists. But there is no evidence that Feingold took or used an Alliantgroup customer list when he left to go work for KLR. Feingold's motion for summary judgment on the conversion claim is granted."). Nevertheless, the allegations are sufficient at this time to preclude dismissal.

All told, StoneEagle's Motion to Dismiss is denied because the record is sufficient to establish standing for breach of contract and to make out a claim for conversion. Insofar as StoneEagle seeks the prospect of summary judgment with an opportunity to present evidence, the Court denies this request and directs the parties to proceed forward.

### b. StoneEagle's Partial Summary Judgment on the '686 Patent

StoneEagle moves for partial summary judgment on the ownership and inventorship status of the '686 Patent. (Doc. 147)

### i. Legal Standard

Summary judgment shall be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must inform the district court of the basis for its belief that there is an absence of a genuine issue of fact and identify those portions of the record that demonstrate such absence. *See Celotex*, 477 U.S. at 323. The district court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Once the moving party makes an initial showing, the party opposing the motion must come forward with competent summary judgment evidence showing genuine issues of fact exist for trial. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The nonmoving party must provide specific facts demonstrating a genuine issue of material fact such that a reasonable jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Mere assertions of a factual dispute unsupported by probative evidence will not prevent summary judgment. *Id.* at 249-50. In other words, conclusory statements, speculation, and unsubstantiated assertions will not defeat a motion for summary judgment. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc); *see also Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 619 (5th Cir. 1993) ("[U]nsubstantiated assertions are not competent summary judgment evidence." (citing *Celotex*, 477 U.S. at 324)). Furthermore, a court has *no duty* to search the record for evidence of genuine issues. *See Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

A party who carries the burden of proof at trial cannot attain summary judgment unless it provides "conclusive" evidence of its claims. *Torres Vargas v. Santiago Cummings*, 149 F.3d 29, 35 (1st Cir. 1998). Therefore, a plaintiff's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the [plaintiff]." *Calderone v. United*

*States*, 799 F.2d 254, 259 (6th Cir. 1986). Otherwise, summary judgment cannot be granted. *Id.* Indeed, "[t]hat the movant appears more likely to prevail at trial is *no* reason to grant summary judgment; it is *not* the province of the court on a motion for summary judgment to weigh the evidence, assess its probative value, or decide factual issues." *Byrd v. Roadway Exp., Inc.*, 687 F.2d 85, 87 (5th Cir. 1982) (emphasis added); *see also Aubrey v. Sch. Bd. of Lafayette*, 92 F.3d 316, 318 (5th Cir. 1996). Nonetheless, if the nonmovant's "evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50.

Although Federal Circuit law is controlling for issues unique to patent law, regional circuit law is binding in the context of judicial admissions. See *Davis v. Brouse McDowell, L.P.A.*, 596 F.3d 1355, 1362 (Fed. Cir. 2010) ("We review evidentiary rulings that are not unique to our jurisdiction under the law of the regional circuit.").

### ii. Analysis

StoneEagle seeks partial summary judgment that: (1) "[StoneEagle] is the owner of the ['686] Patent"; (2) "Allen is the sole inventor of the invention reflected in the ['686] Patent"; (3) "Gillman is not the sole or joint inventor of the invention reflected in the ['686] Patent"; (4) "Gillman is not an owner of the ['686] Patent"; (5) "[Talon-Texas] is not an owner of the ['686] Patent"; and (6) "[Talon-Oklahoma] is not an owner of the ['686] Patent." (Doc. 147, p. 10) Under the Declaratory Judgment Act,

> In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a) (West 2012). Declaratory relief is discretionary and only appropriate in certain cases. *See Centennial Life Ins. Co. v Poston*, 88 F.3d 255, 256 (4th Cir. 1996); *Huth v.*

*Hartford Ins. Co. of the Midwest,* 298 F.3d 800, 803 (9th Cir. 2002) ("[The] decision whether to exercise jurisdiction over a declaratory action lies in the sound discretion of the district court.").

A federal court has the power to hear a declaratory judgment action *only if* there is (1) subject matter jurisdiction, and (2) an actual controversy. *See* § 2201(a); *Hashemite Kingdom of Jordan v. Layale Enters.*, 272 F.3d 264, 270 (5th Cir. 2001) ("On the other hand, the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, does not provide a federal court with an independent basis for exercising subject-matter jurisdiction."). Where, as here, subject matter jurisdiction is not disputed, the analysis gravitates to whether an actual controversy exists. *See* 28 U.S.C. §§ 1331, 1338, 1367 (West 2012); *see also* (Doc. 197, pp. 2-3).

Declaratory relief must resolve an actual controversy between the parties. *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-40 (1937)). An actual controversy is a dispute that is "definite and concrete, touching the legal relations of parties having adverse legal interests." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (citation and internal quotation marks omitted). The controversy "must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop." *Rowan Cos. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989) (quoting *Brown & Root, Inc. v. Big Rock Corp.*, 383 F.2d 662, 665 (5th Cir. 1967)). The filing party has the burden of establishing the existence of an actual controversy. *See Vantage Trailers, Inc. v. Beall Corp.*, 567 F.3d 745, 748 (5th Cir. 2009).

The original assignee of a patent is presumed to own the patent. *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 458 Fed. App'x 910, 912 (Fed. Cir. 2012) ("There is no dispute that Dow is indeed the original assignee of the patents in suit and record title holder at the U. S. Patent and

Trademark Office ('PTO'). Therefore Dow is the presumed owner of the patents in suit."); *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1327-28 (Fed. Cir. 2010) ("The recording of an assignment with the PTO is not a determination as to the validity of the assignment. However, we think that it creates a presumption of validity as to the assignment and places the burden to rebut such a showing on one challenging the assignment." (internal citation omitted)).

StoneEagle asserts that no genuine issues of material fact exist and that it is entitled to summary judgment as a matter of law on the aforementioned six issues. (Doc. 147) To this end, a case or controversy was created when Gillman stated to others that he "authored" or "wrote" the '686 Patent. (*Id.* at 4) To demonstrate a lack of fact issues, StoneEagle references prior judicial admissions where the counsel for Gillman and the Talons admitted that his clients did not invent the '686 Patent and that Allen was the true inventor. (Doc. 147, pp. 4-5; Doc. 148, App. 13) In addition, the '686 Patent lists StoneEagle as the assignee. (Doc. 148, App. 1)

Gillman and the Talons offer a layered argument to rebut these contentions. (Doc. 167-1) Gillman and the Talons contend that there is no case or controversy because they disclaimed ownership and inventorship by stating that (1) they do not own the '686 Patent, and (2) Allen was the inventor. (*Id.* at 3-4 ("Defendants do not claim to own the Patent. . . . Defendant stated in open court that they do not dispute the inventorship of the Patent, and that 'Plaintiff' is the inventor.")) As such, declaratory relief is not proper because no dispute exists on these issues. (*Id.*) Furthermore, a judgment that StoneEagle owns the '686 Patent is not appropriate because the admissions by Gillman and the Talons do not preclude other non-party entities from possibly owning the '686 Patent. (*Id.* at 4) Such a ruling would be overly broad. (*Id.*)

Reviewing the arguments and evidence presented, summary judgment is proper on all six areas of declaratory relief because there is a case or controversy and StoneEagle presents

sufficient uncontroverted evidence to demonstrate that it is entitled to judgment as a matter of law. From the outset, a dispute was triggered by Gillman's prior statements and cannot be retracted based on subsequent concessions in the middle of litigation. The judicial admissions regarding ownership and inventorship did not pull the rug out from underneath StoneEagle; instead this evidence offers a firm ground for relief via summary judgment.[3]

With Gillman and the Talons conceding request numbers 2 through 6, the final issue is whether the record supports request number 1.[4] StoneEagle presents a copy of the '686 Patent that lists StoneEagle as the assignee. (Doc. 148, App. 1) Moreover, Gillman and the Talons admit that they do not own the patent. (Doc. 167-1, p. 3) Notwithstanding that Gillman and the Talons contend that a public record and their admissions does not solidify ownership, they fail to present any evidence that some non-party might be hovering outside of litigation with rights to the '686 Patent. As such, no reasonable juror could conclude that, at the close of evidence, the present record rebuts the presumption of assignee ownership. A bare allegation at the end of a briefing does not create an evidentiary fact issue and does not negate the assignment language found in the patent itself. (*Id.* at 4) To be sure, StoneEagle has come forward with uncontroverted evidence establishing ownership and—rather than rebutting this—Gillman and the Talons essentially cross their arms and ask the Court to demand a better showing without any reassurance that one may come.

---

[3] During the judicial hearing, the counsel for Gillman and the Talons even admitted that default would be proper on the issue of inventorship. (Doc. 147, p. 5, App. 13)

[4] To the extent that Gillman and the Talons raise concerns that StoneEagle seeks an expansive declaration that "Allen is the sole inventor of the subject matter reflected in the Patent," the Court confines its ruling to the declaration that Allen is the sole inventor of the invention within the '686 Patent and *not* its entire subject matter. (Doc. 167-1, p. 2) This ruling reflects the present relief requested and is commensurate with the factual record. (Doc. 148, App. 13)

In sum, summary judgment is proper because there are no genuine issues of material fact and StoneEagle is entitled to declaratory judgment as a matter of law that: (1) StoneEagle is the owner of the '686 Patent; (2) Allen is the sole inventor of the invention reflected in the '686 Patent; (3) Gillman is not the sole or joint inventor of the invention reflected in the '686 Patent; (4) Gillman is not an owner of the '686 Patent; (5) Talon-Texas is not an owner of the '686 Patent; and (6) Talon-Oklahoma is not an owner the '686 Patent.

### c. Gillman and the Talons' Objections to the United States Magistrate's Findings and Recommendation

Gillman and the Talons object on roughly 28 grounds to the United States Magistrate Judge's Findings and Recommendation. (Doc. 152, pp. 1-6) They move for *de novo* consideration because the recommended injunction is "overly broad" and the recommended bond is "insufficient." (Doc. 152-1, p. 2) Gillman and the Talons request that the Court: (1) adopt the portion of the recommendation that finds the injunction to be void ab initio; (2) deny contempt; (3) clarify the protected trade secrets in sufficient detail; (4) set the bond at $23 million; and (5) deny the recommended injunctive language. (*Id.* at 3)

StoneEagle counters that the recommendation should be adopted "because it merely clarifies the Court's preliminary injunction by restating the actions it prohibits." (Doc. 164, p. 3) Specifically: (1) the recommendation does not violate Federal Rule of Civil Procedure 65; (2) the Court may interpret the injunction broadly; (3) the record supports the recommendation; (4) the bond amount is sufficient; and (5) additional evidence should not be considered. (*Id.* at 3-23)

Thereafter, Gillman and the Talons moved to supplement and strike. To supplement their objections, they alleged that StoneEagle's First Amended Complaint brings dueling claims of patent infringement and trade secret misappropriation which are in direct opposition. (Doc. 176,

p. 2) They also moved to strike StoneEagle's proposed preliminary injunction order because the language imposes obligations on non-parties and goes beyond the record. (Doc. 190-1, pp. 5-9) In addition, Gillman and the Talons request leave to address the scope and specifics of StoneEagle's order. (190-1, p. 9; Doc. 199, p. 4)

All of this will be addressed now.

### i. Legal Standard

A district court may designate a magistrate judge to conduct hearings and submit proposed findings of fact and recommendations regarding, *inter alia*, motions for injunctive relief. *See* 28 U.S.C. § 636(b)(1)(B) (West 2012) ("[A] judge may also designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court . . . ."); *see also McFaul v. Valenzuela*, 684 F.3d 564, 579 (5th Cir. 2012). In turn, the parties may submit written objections to the district court. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b). "Objections must be: (1) specific; (2) in writing; and (3) served and filed within 14 days after being served with a copy of [the report]." *Schuett v. Fox*, No. 1:11cv746, 2012 U.S. Dist. LEXIS 117991, *2 (E.D. Tex. July 30, 2012) (citing § 636(b)(1); Fed. R. Civ. P. 6(a)-(b), 72(b)) (internal punctuation marks added). The court need not address nonspecific, frivolous, or conclusory objections. *Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A district court invokes three standards of review for non-dispositive pretrial orders. The court reviews: (1) findings of fact under the clearly erroneous standard; (2) conclusions of law under the *de novo* standard; and (3) "[the] numerous instances in which magistrate judges exercise discretion" under the abuse of discretion standard. *Hamilton v. First Am. Title Ins. Co.*, No. 3:07-CV-1442-G, 2010 U.S. Dist. LEXIS 21157, at *7-9 (N.D. Tex. Mar. 8, 2010) (quoting

*AMS Staff Leasing, NA, Ltd. v. Associated Contract Truckmen, Inc.*, No. 3:04-CV-1344-D, 2005

U.S. Dist. LEXIS 28919, at *2 (N.D. Tex. Nov. 21, 2005)); *see also* § 636(b)(1)(A); Fed. R. Civ.

P. 72(a). First, if the "account of the evidence is plausible in light of the record viewed in its

entirety," then that account is *not* clearly erroneous. *Smith v. Smith*, 154 F.R.D. 661, 665 (N.D.

Tex. 1994) (quoting *Resolution Trust Corp. v. Sands*, 151 F.R.D. 616, 619 (N.D. Tex. 1993)).

Second, as "freely reviewable," the district court judge reviews legal conclusions *de novo* and

reverses if the magistrate judge erred in some respect. *Lahr v. Fulbright & Jaworski, L.L.P.*, 164

F.R.D. 204, 208 (N.D. Tex. 1996) (citing *RTC v. Sands*, 151 F.R.D. 616, 618 (N.D. Tex. 1993)).

Finally, abuse of discretion arises when the district court "has a definite and firm conviction that

the court below committed a clear error of judgment in the conclusion it reached upon a

weighing of the relevant factors." *Dell Computer Corp. v. Rodriguez*, 390 F.3d 377, 385 n.14

(5th Cir. 2004) (quoting *United States v. Walker*, 772 F.2d 1172, 1176 n.9 (5th Cir. 1985)).

Based on its review, the district court may "accept, reject, or modify the recommended

disposition; receive further evidence; or return the matter to the magistrate judge with

instructions." Fed. R. Civ. P. 72(b)(3).[5]

### ii. Analysis

Applying these legal standards, the Court reviews: (1) the findings of fact; (2) the legal

conclusions on the pending motions; and (3) the bond amount.

### 1. Findings of Fact

---

[5] Defendants unsuccessfully argue that the Court should conduct a *de novo* review of the findings and recommendation. (Doc. 152, pp. 2-3) A court conducts *de novo* review of a magistrate judge's legal conclusions—not the entire matter. Moreover, Defendants have not demonstrated a compelling reason to apply the *de novo* standard. Accordingly, the Court will use the standards as set forth above.

Gillman and the Talons contend that Magistrate Judge Kaplan erred in his factual findings to the extent that the clarification of the injunction was in essence a "new" injunction based on evidence not found in the record. (Doc. 152-1, pp. 3-12; Doc. 169) They argue that the magistrate judge erred in finding that: (1) there was evidence of trade secret misuse; (2) Gillman learned about StoneEagle's trade secrets and confidential information during "whiteboard sessions" and other meetings; (3) the similarities between the NexPay cards and the VPay cards are evidence of trade secret misappropriation; (4) Allen originated the idea of virtual payment systems in the medical industry; and (5) Gillman was "less clear" on what confidential information he and his companies contributed to the process. (Doc. 152-1, pp. 10-21) In addition, Gillman and the Talons request that the Court review three materials not considered in the hearing: the '686 Patent, the file history, and the case *StoneEagle Fin. Serv., Inc., et al., v. Valentine, et al.*, case number 3:12-cv-01687-P. (Doc. 152-1, pp. 22-24)

After reviewing the record, the Court finds that the magistrate judge's factual findings are *not* clearly erroneous. From the outset, the nine-hour hearing bears out that Allen was the first to consider the idea of virtual payments in the medical industry. (Doc. 153-1, App. 38-39, 257, 315) The evidence presented at the hearing demonstrates that during Gillman's meetings and "white board sessions" with Allen, Gillman became privy to trade secrets and confidential information relating to StoneEagle's virtual payment system. (*Id.* at 47-48) The record also supports the finding that Allen explained in detail the type of confidential information allegedly shared with Defendants. (*Id.* at 46-47, 78-86) Specifically, Allen described the VPay process, including: (1) the identification of billing information; (2) how funds are identified and acquired, (3) the stored-value card applications; (4) the reconciliation process; and (5) the fraud detection devices. (*Id.* at 46-47, 81, 118, 150-62, 168, 174-75.) Moreover, Defendants were not making

virtual payments utilizing stored-value card technology prior to their relationship with StoneEagle. (*Id.* at 81) In addition, the testimony and evidence presented at the hearing showed that Gillman's company, NexPay, was attempting to use the VPay card by replacing the "VPay" logo with the "NexPay" logo. In fact, some of the "copying and pasting" produced VCards that displayed the "NexPay" logo, but still included VPay information. (*Id.* at 89, 97-98, 222-23, 230-32) Finally, when asked what trade secrets or confidential information StoneEagle was misappropriating, Gillman was unable to provide specifics. (*Id.* at 330) Taken together, the foregoing evinces trade secret misuse. (*Id.* at 69-72, 92-101, 126-31, 249-50, 313, 328)

Accordingly, the Court accepts and adopts the factual findings of the magistrate judge.[6]

## 2. Legal Conclusions

Under these factual findings, the United States Magistrate Judge recommended that the Court: (1) deny contempt; and (2) adopt a clarified preliminary injunction. (Doc. 144)

### a. StoneEagle's Second Motion for an Order to Show Cause Why Defendants Should Not Be Held in Contempt

The magistrate judge recommended denial of StoneEagle's motion for contempt because—while Gillman and the Talons violated "the spirit" of the preliminary injunction— the original order was vague and did not define certain material terms. (Doc. 144, pp. 6-7)

Federal Rule of Civil Procedure 65 requires an injunction to "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). An injunction is vague or overbroad if it fails to specify with

---

[6] In an abundance of caution, even after giving *de novo* review to the "new evidence" supplied by Gillman and the Talons, the record *still* supports the findings of the magistrate judge. (Doc. 152-1, pp. 21-24) In short, to the extent that the '686 Patent may disqualify the trade secret nature of StoneEagle's actions, the record demonstrates that certain processes may coexist outside of the patent and file history. In addition, isolated statements from the companion case do not overturn the magistrate judge's findings. (Doc. 153-1, App. 35-36)

sufficient detail the acts to be restrained. *Doe v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004) ("An injunction fails to meet these standards [as articulated in Rule 65(d) when it is overbroad or vague."). Injunctions that are vague or overboard violate Rule 65. *See, e.g., id.* at 819-20 (dissolving an injunction because "[a]lthough the definition of personal information includes 'reasonable detail,' it is not specific in its terms because it encumbers the federal defendants with determining what combination of information might enable API, or others for that matter, to determine the name, address, ranch, or location of a Cooperator").

The parties do not object or dispute this recommendation. Perhaps most telling, StoneEagle's proposed order denies its own motion without equivocation. (Doc. 188, p. 17)

In short, the Court accepts and adopts the recommendation to deny StoneEagle's motion for contempt.

### b. Clarification of the Preliminary Injunction

Gillman and the Talons argue that the proposed "new" injunction violates Rule 65 because: (1) they did not receive notice that a new injunction was in contemplation; and (2) the recommended injunction is overbroad.[7] (Doc. 152-1) StoneEagle counters that the Court should adopt the recommendation because it merely clarifies the preliminary injunction entered in October 2011 by restating the prohibited actions in alternative terms without changing the parties' original relationships. (Doc. 164)

As a starting point, the Court finds that the preliminary injunction entered in October 2011 does not satisfy the requirements of Rule 65(d). The original injunction seemingly

---

[7] Gillman and the Talons also argue that the findings and recommendation do not reference the Rule 65 factors that a court must weight to institute an injunction. (Doc. 152-1, pp. 6-7) This assertion fails for two reasons. First, the Court has already found that a preliminary injunction is necessary in Docket Number 16 and Defendants fail to present evidence to undermine this ruling. Second, this Order is a clarification of a preexisting injunction and not a modification. As such, the underlying factual basis and legal conclusion justifying the injunction remains undisturbed.

contravenes the federal rules by referring to several external documents. (Doc. 16, pp. 9-10); *see also* Fed. R. Civ. P. 65(d)(1)(C). The magistrate judge recommended clarifying the injunction in order to comport with Rule 65 and prevent unwitting contempt.

Next, reviewing the language from the findings and recommendation, the Court determines that the clarification provided by the magistrate judge is overly broad. (Doc. 144) In particular, the recommendation appears to adopt non-compete language and fails to direct the parties to the actual intellectual property at issue. In addition, the recommendation enjoins non-parties without a finding to support aiding and abetting activity. Therefore, the Court declines to adopt the recommended injunctive language.

Having found that the recommended injunction does not serve the interests of the parties, the Court clarifies the original preliminary injunction. A court may *modify* an injunction by altering the legal relations among the parties or substantially changing the scope of the injunction. *Mikely v. Gourley*, 951 F.2d 166, 169 (8th Cir. 1991); *see also Gon v. First State Ins. Co.*, 871 F.2d 863, 865 (9th Cir. 1989). "[T]o effect a change in the legal relationship of the parties, the order must 'change the command of the earlier injunction, relax its prohibitions, or release any respondent from its grip.'" *Birmingham Fire Fighters Ass'n 117 v. Jefferson Cnty.*, 280 F.3d 1289, 1293 (11th Cir. 2002) (quoting *Sierra Club v. Marsh*, 907 F.2d 210, 213 (1st Cir. 1990)). In contrast, a court may *clarify* "the scope of an injunction in order to facilitate compliance with the order and to prevent 'unwitting contempt.'" *Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*, 25 F. Supp. 2d 372, 374 (S.D.N.Y. 1998) (quoting *Regal Knitwear Co. v. Nat'l Labor Relations Bd.*, 324 U.S. 9, 15 (1945)). A clarification should occur when there is "a concrete situation that [leaves] parties or 'successors and assigns' in the dark as to their duty toward the court." *Id.* (quoting *Regal Knitwear*, 324 U.S. at 15). Such orders must be consistent

with prior findings. *Id.*; *see also Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States Co.*, 195 F.3d 765, 769 (5th Cir. 1999) ("The line between modification and interpretation is a functional one, and the dispositive issue is whether 'the ruling appealed from can fairly be said to have changed the underlying decree in a jurisdictionally significant way.'" (quoting *Sierra Club*, 907 F.2d at 212)).

Considering the various filings on this matter, the Court issues the following order clarifying the previous preliminary injunction.[8] Gillman, the Talons, and their respective agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive notice of this Order by personal service or otherwise, are hereby enjoined to refrain from using any materials or processes—tangible or intangible—first developed by StoneEagle for the purposes of directly or indirectly:

---

[8] In this ruling, the Court considers the Motions to File Supplemental Objections and Strike filed by Gillman and the Talons. (Docs. 176-77, 190, 199)

*First*, the Court grants the Motion to File Supplemental Objections and considers these arguments. (Docs. 176, 177) At bottom, Gillman and the Talons argue that StoneEagle cannot allege trade secret actions and patent infringement claims under the same underlying facts. (Doc. 177, pp. 2-4) As previously stated, Gillman and the Talons have never claimed that they learned about the virtual payment process by examining the patent. The evidence demonstrates that they learned about the process through "whiteboard meetings" with Allen. *See, e.g., Phillips v. Frey*, 20 F.3d 623, 629 (5th Cir. 1994) ("A process or device may be a trade secret even where others can gain knowledge of the process from studying the manufacturer's marketed product."). Here, the enjoined parties gained information about the process through its relationship with StoneEagle and not through the publication of the '686 Patent. Furthermore, the findings establish that there may be ancillary information outside of the patent's claims that constitute StoneEagle's trade secrets. Thus, claims for patent infringement and trade secret misappropriation may coincide in harmony.

*Second*, the Court grants the Motion to Strike, but denies the Request for Leave. (Docs. 190, 199) Gillman and the Talons argue that StoneEagle drafted a preliminary injunction order that exceeds the Court's jurisdictional bounds by including non-parties and restricting activities independent of the parties. (Doc. 190-1) Under Rule 65(d)(2), a court may enjoin "persons who are in active concert or participation" with the parties or the parties' agents. Fed. R. Civ. P. 65(d)(2). Here, StoneEagle proposes to enjoin "Vince Valentine, Jim Valentine, Tom Davis, Jennifer Lewis, or ECHO Health, Inc., under the brand name NexPay or QuicRemit or another brand name," along with others who act in concert with Gillman and the Talons. (Doc. 188, pp. 16-17) These provisions invite the Court to assume, without a factual finding, that these entities acted or are poised to act in concert or participation with the enjoined parties. In the event that these entities are in fact aiders and abettors, StoneEagle may alert the Court to these actors as they come into proper view. Inasmuch as Gillman and the Talons request leave to file even more objections to StoneEagle's proposed order, the Court denies this request as overly duplicative and without a legal basis.

(1)     Requesting, directing, enabling, or facilitating the acquisition of payment data (such as payee name, payment amount, payee address, and payee tax identification number) and related payment advice, explanation of benefit, or explanation of payment data from an insurance company, a third-party administrator ("TPA") or other payor of healthcare claims and reporting such payment data to a program manager, card processor, financial institution or other entity that facilitates the issuance of a virtual stored value card to make a payment for healthcare goods or services;

(2)     Enabling or facilitating the determination of whether a provider of healthcare goods or services should be paid with a virtual stored value card in lieu of some other medium of payment, such as a check or electronic funds transfer;

(3)     Requesting, directing, enabling, or facilitating the acquisition of the primary account number, expiration date and card security code for a virtual stored value card from a program manager, processor, financial institution or other entity that provides such card data to make a payment for healthcare goods or services;

(4)     Requesting, directing, enabling, or facilitating the transfer of funds to a financial institution for the purpose of loading or funding a virtual stored value card to make a payment for healthcare goods or services;

(5)     Licensing, assigning, accessing, using, or disclosing the provider database that contains the historical compilation of payment information (including fax numbers) and preferences of health care providers populated between June 29, 2006, and March 26, 2012; or

(6)     Requesting, directing, enabling, or facilitating the unloading of funds associated with a virtual stored value card account and the transfer or re-allocation of such funds for another purpose, such as to fund a check or electronic funds transfer or to return the funds to the funding party.

In addition, the Court enjoins these entities from using the following types of software to the extent that such software was first developed by StoneEagle:

(7)     loader programs customized to each different TPA such that the TPA's proprietary file formats containing payment data can be converted to a standard file format and loaded into a database;

(8)     document replicating software that creates exact copies of the TPA's payment documents from the TPA's data loaded into a database;

(9) imaging programs that create electronic payments from the payment documents;

(10) payment optimization programs that provide for a provider database that includes payment preference information for each different provider that allows a specific and preferred type of payment to be transmitted to the provider;

(11) banking communication software that requests from the depository bank the balance of accounts on which payments are going to be drawn to confirm that funds are available prior to distributing payments;

(12) payment batching programs that allow payments to be administered by the TPA such that certain payments may be held out waiting for further funding, sent by express mail, or re-routed back to the TPA;

(13) creating a data stream communicated to print outsourcer for the purpose of printing checks and other mailed output; or

(14) customer service software that allows for customer service representatives to interact with providers of healthcare to answer questions and perform tasks such as changing the payment type for the provider and issuing a new form of payment, or reissuing payments that have been lost or otherwise unaccounted for.

The Court finds that StoneEagle has a substantial likelihood of success on the merits and if these entities are not restrained, they will commit or continue to commit the acts listed above. Further, if these acts are not restrained immediately, there is a threat of irreparable harm to StoneEagle manifested by losing its core intellectual property. This injury outweighs the harm that the enjoined entities would suffer under the clarified injunction. Taken together, such an order does not disserve the public interest.

In short, the Court does not adopt the recommended injunctive language and instead issues the clarification described above.

### 3. Bond Amount

The magistrate judge recommended that StoneEagle post a $100,000 bond before the clarified preliminary injunction goes into effect. (Doc. 114, p. 8) Cognizant that such an

injunction may "result in the loss of a fledging, but ongoing, business," the magistrate judge raised the bond amount from $10,000 to $100,000. (*Id.*) Pursuant to Rule 65(c), a party moving for a preliminary injunction must "give security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[T]he amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court.'" *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman,* 569 F.2d 300, 303 (5th Cir. 1978)).

Gillman and the Talons argue that $23 million is a reasonable bond amount because their business losses "during the pendency of this lawsuit [range] from $3 million to $23 million." (Doc. 152-1, pp. 2-3, 21; Doc. 153-1, App. 374-76) This argument rests on testimony provided by Thomas Stewart ("Stewart"), a Texas Certified Public Accountant, as well as charts and graphs depicting the financial status of the entities to be enjoined. (Doc. 153-1, App. 350, 1584-95) Rather than presenting rebuttal evidence, StoneEagle highlights that Stewart admitted to not quantifying the expenses that would be incurred if virtual payment processing ceased, not following the Uniform Standards of Professional Appraisal Practices, not considering alternatives to service customers, and not considering the two months of business that NexPay had done previously without StoneEagle. (*Id.* at 371-72, 376-77, 382-83, 390-92)

As a matter of discretion, after reviewing the evidence, a bond amount totaling $100,000 is appropriate in this case. Should fears of business collapse come to light in the magnitude suggested by the enjoined parties, they may always move for relief to address this turn of events. *See, e.g., TGI Friday's, Inc. v. Great Nw. Rests., Inc.*, 652 F. Supp. 2d 763, 774 (N.D. Tex. 2009) ("If defendants can show that the bond should be increased, they may move separately for that

relief."); *Gryphon Master Fund, L.P. v. Path 1 Network Techs., Inc.*, No. 3:06-CV-0107-D, 2007 U.S. Dist. LEXIS 43117, at *22 (N.D. Tex. June 14, 2007) ("The court will therefore leave in place the bond of $50,000 that Gryphon posted to obtain the TRO. If Path 1 can show that the bond should be increased to some amount less than $ 3.4 million, it may move separately for that relief.").

Accordingly, the Court accepts and adopts the magistrate judge's recommendation that StoneEagle provide a bond in the amount of $100,000 for the clarified preliminary injunction.

### d. StoneEagle's Motion to Dismiss NexPay's Declaratory Judgment Action

StoneEagle moves to dismiss NexPay's declaratory judgment action for non-infringement of the '686 Patent. (Doc. 8, 3:12-cv-04397-P) NexPay's Original Complaint seeks a declaration that "[t]he technology that NexPay developed does not and has not infringed, literally or under the doctrine of equivalents, directly, contributorily, by inducement, or jointly, any valid and enforceable claim of the '686 Patent, willfully or otherwise." (Doc. 1, p. 3, 3:12-cv-04397-P)

As stated previously, federal courts have considerable discretion when determining whether to entertain a declaratory judgment action. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286-87 (1995) ("The statute's textual commitment to discretion, and the breadth of leeway we have always understood it to suggest, distinguish the declaratory judgment context from other areas of the law in which concepts of discretion surface."); *Public Serv. Com. v. Wycoff Co.*, 344 U.S. 237, 241 (1952) ("This is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."). If a declaratory judgment action adds nothing to the existing lawsuit, it should be dismissed. *See Burlington Ins. Co. v. Ranger Specialized Glass, Inc.*, No. 4:12-CV-1759, 2012 U.S. Dist. LEXIS 177961, at *9 (S.D. Tex. Dec. 12, 2012) ("Courts in the Fifth Circuit have regularly rejected declaratory judgment claims that seek

resolution of matters that will already be resolved as part of the claims in the lawsuit.") (citing cases); *Regus Mgmt. Grp., LLC v. IBM*, No. 3:07-CV-1799-B, 2008 U.S. Dist. LEXIS 47276, at * 5-6 (N.D. Tex. June 17, 2008) ("In the Federal Rule of Civil Procedure 12(b)(6) context, courts regularly reject declaratory judgment claims that seek resolution of matters that will already be resolved as part of the claims in the lawsuit.") (citing cases). Moreover, "a motion for declaratory judgment that merely restates a party's defenses is insufficient unless the party can prove that there are issues of greater ramification to be resolved." *Zytax, Inc. v. Green Plains Renewable Energy, Inc.*, No. H-09-2582, 2010 U.S. Dist. LEXIS 52617, at *18-19 (S.D. Tex. May 28, 2010) (quoting *Hanson Aggregates, Inc. v. Roberts & Schaefer Co.*, No. 3:05-cv-1883-P, 2006 U.S. Dist. LEXIS 55353, at *3 (N.D. Tex. Aug. 9, 2006)).

The parties dispute whether this claim should be dismissed in light of timing and the recent case consolidation. StoneEagle argues that NexPay's declaratory judgment action is a "mirror image" of the existing patent infringement claim against NexPay. (Doc. 8, p. 3, 3:12-cv-04397-P) NexPay counters that dismissal is not proper because it originally filed for declaratory relief in a separate action at a time when it was not party in this lawsuit and no patent infringement claims were pending in any action. (Doc. 221, p. 2)

Considering the arguments, dismissal is proper because NexPay's request for a declaration that it does not infringe on the '686 Patent is synonymous with StoneEagle's patent infringement claim. (*See* Doc. 1, p. 3, 3:12-cv-04397-P; Doc. 197, pp. 21-22) While NexPay advances the theory that a party who is first-to-file should be entitled to a certain amount of deference, this notion gives way to judicial economy. NexPay fails to address how its declaratory relief action adds something to a lawsuit already involving a patent infringement claim against four parties. Stated differently, nothing at all changes if NexPay's declaratory

action ceases to exist because StoneEagle's claim for patent infringement involves the *same* patent, the *same* issues, and the *same* end result. *Compare Burlington*, 2012 U.S. Dist. LEXIS 177961, at \*10 ("Because the counterclaim for declaratory relief is duplicative of TBIC's claim, the Court must grant TBIC's motion to dismiss Swinerton's claim for declaratory relief."), *with 5436, LLC v. CBS Corp.*, No. H-08-3097, 2009 U.S. Dist. LEXIS 96796, at \*51-52 (S.D. Tex. Oct. 16, 2009) ("In response, CBS persuasively argues that its request for declaratory relief is not redundant because, while its claims for damages and specific performance are aimed at remedying alleged past breaches of the Remediation Agreement, the declaratory action will control the ongoing and future relationship between CBS and 5436 regarding the continuing remediation of the Property." (internal quotation marks omitted)).

In short, the Court dismisses NexPay's claim for declaratory relief because NexPay fails to show how the resolution of this action would eclipse the resolution of other existing claims.

## III.    Conclusion

For the foregoing reasons, the Court:

DENIES StoneEagle's Motion to Partially Dismiss the Second Amended Answer and Counterclaims. In addition, the Court DENIES the Request to Convert this Motion into a Motion for Summary Judgment;

GRANTS StoneEagle's Motion for Partial Summary Judgment. Therefore, the Court DECLARES: (1) StoneEagle is the owner of the '686 Patent; (2) Allen is the sole inventor of the invention reflected in the '686 Patent; (3) Gillman is not the sole or joint inventor of the invention reflected in the '686 Patent; (4) Gillman is not an owner of the '686 Patent; (5) Talon-Texas is not an owner of the '686 Patent; and (6) Talon-Oklahoma is not an owner the '686 Patent;

ACCEPTS and ADOPTS the United States Magistrate Judge's Findings and Recommendation on StoneEagle's Second Motion for an Order to Show Cause Why Defendants Should Not Be Held in Contempt. Therefore, the underlying Motion is DENIED;

DECLINES to ADOPT the United States Magistrate Judge's Findings and Recommendation on Gillman and the Talons' the Motion for Clarification of the Preliminary Injunction Order. Therefore, the Court CLARIFIES the preexisting Preliminary Injunction Order consistent with the rulings above. In doing so, the Court GRANTS the underlying Motions to Clarify, Strike, and Supplement filed by Gillman and the Talons. In addition, the Court DENIES the Request for Leave filed with the Motion to Strike;

ACCEPTS and ADOPTS the United States Magistrate Judge's Findings and Recommendation that StoneEagle should provide a bond in the amount of $100,000 for the clarified preliminary injunction; and

GRANTS StoneEagle's Motion to Dismiss NexPay's Original Complaint.


**IT IS SO ORDERED.**


Signed this ___19th___ day of February, 2013.


_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE